UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Richard L. Kinzel, et al.,                                  Case No. 3:10cv2169

        Plaintiffs

    v.                                                             MEMORANDUM
                                                    OPINION & ORDER


Bank of America, et al.,

        Defendants


### INTRODUCTION AND BACKGROUND

This case involves a dispute over the good faith performance of contractually-apportioned discretion. Richard and Judith Kinzel are long-time customers of Merrill Lynch.[1] In 1972, Richard began a remarkable rise in a career in the amusement park industry worthy of a Horatio Alger Award. He began working in the food service department at the Cedar Point Amusement Park in Sandusky, Ohio. He soon moved into the operations side of the business and assumed responsibility for the roller coasters and other rides, as well as live entertainment at the park. In 1978, Richard was promoted to vice president and moved to Minnesota to oversee operations at a newly-acquired amusement park called Valleyfair. Cedar Point and Valleyfair formed a company known as Cedar Fair, which has expanded to include properties throughout North America.

---

[1] Throughout this opinion, I will use "Merrill Lynch" to refer to the remaining defendants and counterclaimants in this action, including Merrill Lynch Bank U.S.A., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch Bank & Trust Co., and Bank of America (as successor in interest to the Merrill Lynch companies).

Richard became the President and CEO of Cedar Fair in December 1986, and served in that capacity until his retirement on January 1, 2012.

While CEO, Richard often obtained Cedar Fair stock through withholding a portion of his paycheck and taking a percentage of his periodic bonuses in stock. Richard typically took 60 percent of his bonus in Cedar Fair stock and the remaining 40 percent in cash to pay taxes associated with the stock. (Doc. No. 200 at 31). In April 2008, Richard exercised an option to purchase 650,000 units of Cedar Fair. The exercise price for these units totaled just over $4 million, while the amount of taxable compensation exceeded $11 million. (Ex. 1). On April 3, 2008, Cedar Fair was trading at $23.18 per unit on the New York Stock Exchange. (Id.). In order to finance the purchase under the stock option and pay the taxes associated with the purchase without liquidating other assets, the Kinzels pursued a loan from Merrill Lynch.

The Kinzels' son Brett worked as a financial advisor in Merrill Lynch's Sandusky, Ohio, office. After discussing various Merrill Lynch products, the Kinzels decided to open a Loan Management Account ("LMA"). An LMA is "an uncommitted revolving line of credit account," secured initially through the assignment of a lien and security interest in specified securities accounts. (Ex. 87 at 1; Doc. No. 1-1 at 1). The Kinzels executed the LMA Agreement as trustees on behalf of revocable trusts established in their names. I previously ruled Richard and Judith Kinzel are "other parties" to the LMA Agreement and therefore have standing to sue in their individual capacities as well as in their capacities as trustees. (*See* Doc. No. 154).

At the time the LMA Agreement was executed, Merrill Lynch utilized a policy that set default standards for the advance and maintenance level ratios relative to various types of LMA-eligible collateral. These ratios determine the extent to which the value of the pledged collateral must exceed the balance of the loan. For example, Merrill Lynch assigned lower ratios to largely static investment vehicles such as U.S. Treasury bonds and Certificates of Deposit. (Ex. 80 at 2).

2

The advance ratio for U.S. Treasury bonds was 92%; thus the policy permitted Merrill Lynch to make an initial loan of 92 cents for every dollar of collateral pledged. The maintenance ratio for these bonds was 95%. Under this ratio, the outstanding loan balance should be equal to or less than 95 cents for every dollar of collateral pledged. The policy assigned higher ratios to more dynamic vehicles such as common stock. Common stock generally carried a 50% advance ratio and a 70% maintenance ratio. (Ex. 80 at 2). Non-standard collateral, such as stock affected by Rule 144,[2] must go through an additional review by Merrill Lynch Credit Specialists before being approved as collateral for an LMA. (Ex. 80 at 6).

The LMA had an $8 million limit, and the Kinzels withdrew approximately $7.7 million to exercise the option and cover the associated tax consequences. (Doc. No. 200 at 42). The Kinzels pledged the 650,000 units acquired as collateral in support of the LMA, though Merrill Lynch, relying on Rule 144, underwrote the LMA against only 540,000 units. (*See, e.g.,* Ex. 8). Additionally, the Kinzels pledged non-Cedar-Fair stocks and bonds to secure the loan. The Kinzels began making payments against the principal balance and accruing interest in May of 2008, and had paid approximately $1.8 million by the end of 2008.

The LMA Agreement does not contain a repayment schedule, though, among other things, it provides mechanisms for Merrill Lynch to obtain repayment of the loan. The LMA Agreement permits Merrill Lynch to demand immediate repayment of some or all of the LMA balance. (Ex. 87 at 3, Doc. No. 1-1 at 3). It also gives Merrill Lynch "sole discretion" (1) to set the Maintenance Requirement for the LMA, which is the minimum value of the financial assets held in the pledged Securities Accounts, and (2) to determine the types of assets held in those accounts. (Id. at 4). Further, the LMA Agreement gives Merrill Lynch the ability "in its sole discretion and without prior

---

[2] The Securities and Exchange Commission has promulgated Rule 144, which regulates the resale of restricted securities. Rule 144 limits the resale of these securities, over a three-month period, to an amount equal to the greater of 1% of the outstanding number of shares of the security or the average reported weekly trading volume during the four weeks preceding the filing of a notice of sale on Form 144. 17 C.F.R. § 230.144. Merrill Lynch analyzed the Cedar Fair units under the assumption the resale of those units was impacted and limited by Rule 144. (Doc. No. 208 at 33-34).

notice" to exercise specified rights and remedies "upon the occurrence of a Remedy Event," including the right to (1) demand immediate repayment, (2) require additional collateral, or (3) liquidate collateral held in the Securities Accounts or otherwise pledged in support of the LMA. (Id. at 6). The LMA Agreement defines "a Remedy Event" in 12 ways, including (1) the Borrower's failure to pay upon demand, (2) breach of the LMA Agreement by a Loan Party, (3) "if the value of the financial assets in the Securities Account or other collateral is in the sole judgment of Bank insufficient," and (4) if the Bank believes in good faith that . . . the value of the collateral or the Bank's security interest therein is impaired." (Ex. 87 at 5; Doc. No. 1-1 at 5). The parties agree Merrill Lynch did not make a demand for repayment and the Kinzels did not breach the LMA Agreement prior to liquidation.

While the Kinzels continued to make payments on the LMA, the value of the Cedar Fair units, along with the stock market generally, continued to decrease and the loan first exceeded the Maintenance Requirement in October 2008. (Ex. 21). The Kinzels remedied this scenario by making payments on the loan balance and pledging additional collateral. (Ex. 78). The loan approached a collateral call in November 2008, and the Kinzels again took steps to secure the loan. (Ex. 22 and 78).

But the difficulties with the LMA intensified as 2009 began. Richard testified he spoke with Doug Rosen, a Merrill Lynch Vice President and Private Lending Advisor who assisted in managing the Kinzel LMA, approximately two or three times per week beginning in mid-January 2009. (Doc. No. 201 at 10). The Kinzels liquidated other assets, including bonds and non-Cedar-Fair stock holdings, and applied the proceeds to the LMA balance. They pursued home equity lines of credit on their home in Sandusky and a condominium they owned in Naples, Florida, and informed Merrill Lynch they would receive a significant amount of cash by mid-March 2009 in the form of a tax return and Richard's periodic bonus. The Kinzels' primary motivation in taking these steps, which

4

they frequently communicated to Merrill Lynch, was to avoid liquidating any of their Cedar Fair holdings. (Doc. No. 201 at 26).

The Kinzels made some progress in retiring the loan. At the end of 2008, the LMA had a balance of $5.94 million, with $10.67 million pledged as collateral. (Ex. 78). At the end of January 2009, the balance of the LMA was $5.44 million, the required minimum collateral value was $11.83 million, and the value of the pledged collateral was $12.04 million. (Ex. 79 at 1). At the end of February 2009, the balance of the LMA was $4.0 million, and the value of the pledged collateral was $10.21 million. (Ex. 79 at 6). The required minimum collateral, however, had increased to $13.9 million. (Id.). Mike Yanovitch, who oversaw the Kinzels' LMA on behalf of Merrill Lynch's Global Risk Management Group, explained that, at times, Merrill Lynch would "change the advance and maintenance levels at a particular point in time without notice to the client . . . [with] the net result being a margin call which can compel repayment." (Doc. No. 211 at 46).

The LMA encountered collateral calls on February 12 and February 20, 2009. (Ex. 31 and 32). The Kinzels addressed these calls by depositing cash as well as selling bonds and applying the proceeds to the loan balance. They also offered additional units of Cedar Fair as collateral, which Merrill Lynch began to analyze for the purpose of assigning maintenance value to those units. (Ex. 33 and 35). These steps, however, left almost exclusively Cedar Fair units as the collateral securing the LMA.

On February 24, 2009, Yanovitch calculated the break-even price – the minimum price per Cedar Fair unit necessary to cover the loan balance –as $6.41. (Ex. 36 at 1; Doc. No. 210 at 74). He then approved a price trigger of $7 per unit as the tipping point for the initiation of liquidation measures. (Ex. 41 at 2; Doc. No. 210 at 74-75).

On March 2, 2009, Rosen informed Brett Kinzel that Merrill Lynch would look for immediate repayment on the loan balance if Cedar Fair began trading below $7 per share. (Ex. 47).

5

When the market closed that evening, Cedar Fair had fallen below $7, and Merrill Lynch began liquidating Cedar Fair units the following day. (Ex. 49). Merrill Lynch sold 167,900 units at an average price of $6.3806 per unit, for a total of approximately $1.07 million. (Ex. 71). The Kinzels continued transferring cash into the LMA to pay down the balance and also provided documentation of forthcoming funds to further retire the debt. As a result, Merrill Lynch suspended liquidation and instituted a new price trigger of $5.50 per share. (Ex. 74). The Kinzels paid off the balance of the LMA on March 26, 2009.

Subsequently, the Kinzels filed suit, asserting, among other things, that Merrill Lynch's sale of their Cedar Fair units was impermissible. I dismissed most of the claims they alleged through the parties' motion practice, and the case proceeded to a bench trial on the sole remaining claim of breach of the implied covenant of good faith and fair dealing.

## IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The parties' dispute is governed by Utah law. (Ex. 87 at 9; Doc. No. 1-1 at 9). The implied covenant of good faith and fair deals imposes "as a term of every contract a duty to perform in the good faith manner that the parties surely would have agreed to if they had foreseen and addressed the circumstance giving rise to their dispute." *Young Living Essential Oils, LC v. Marin*, 266 P.3d 814, 816 (Utah 2011). Under this covenant, parties have an implied duty to "refrain from actions that will intentionally destroy or injure the other party's right to receive the fruits of the contract." *Oakwood Vill. LLC v. Albertsons, Inc.*, 104 P.3d 1226, 1239 (Utah 2004) (quotation omitted). "Such a duty advances the core function of the covenant, as no one would reasonably accede to a contract that left him vulnerable to another's opportunistic interference with the contract's fulfillment." *Young Living*, 266 P.3d at 817. Utah courts evaluate breach of good faith and fair dealing claims "by considering the contract language *and* the course of dealings between and conduct of the parties." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991) (emphasis in original).

6

The LMA Agreement assigns discretion to Merrill Lynch in four relevant areas: (1) Merrill Lynch has "sole discretion" to set the Maintenance Requirement level; (2) Merrill Lynch may exercise its "sole judgment" in determining whether the value of collateral is insufficient; (3) Merrill Lynch can determine "in good faith" whether the value of collateral or Merrill Lynch's security interest in that collateral is "impaired"; and (4) "upon the occurrence of a Remedy Event" such as is stated in (2) and (3) above, Merrill Lynch may exercise its "sole discretion" to require additional collateral or liquidate securities or assets pledged as collateral for the LMA. (Ex. 87 at 4-6; Doc. No. 1-1 at 4-6). Only (3) literally states the legal meaning of its provision. The covenant of good faith and fair dealing "forbids arbitrary action by one party that disadvantages the other" and implies into the term "sole discretion" a duty to make "a 'judgment based upon sincerity, honesty, fair dealing and good faith, not one evidencing caprice or bad faith.'" *Resource Mgmt. Co. v. Weston Ranch and Livestock Co., Inc.*, 706 P.2d 1028, 1037-38 (Utah 1985) (quoting *Blish v. Thompson Automatic Arms Corp.*, 64 A.2d 581, 597 (Del. 1948)). A party exercising contractually-apportioned discretion may not "wrongfully exercise its discretionary power or contractual authority for a reason beyond the risks that the other party assumed or for a reason inconsistent with the other party's justified expectations." *Oman v. Davis School Dist.*, 194 P.3d 956, 968 (Utah 2008).

The remaining questions to be decided are whether Merrill Lynch breached its duty under the covenant of good faith and fair dealing in concluding the value of the Cedar Fair units was insufficient to support the outstanding balance on the LMA or in liquidating those units when the unit price hit a predetermined price trigger. The Kinzels bear the burden of proving their claim by a preponderance of the evidence, a standard that requires

> the evidence be such that reasonable minds acting fairly thereon could believe that the existence of the fact is more probable or more likely than its nonexistence, so that a person of ordinary prudence could believe the fact with sufficient assurance to act upon it in relation to matters of serious concern in his own affairs.

*Morris v. Farmers Home Mut. Ins. Co.*, 500 P.2d 505, 507 (Utah 1972) (citation omitted).

7

After hearing the testimony given and reviewing the exhibits submitted during trial, I conclude Plaintiffs have not satisfied their burden of proof. The evidence presented does not establish it is more likely than not that Merrill Lynch acted with the intent to destroy or injure the Kinzels' right to receive the fruits of the LMA Agreement. In *Northgate Vill. Dev. LC v. Orem City*, the parties had entered into a purchase agreement for the sale and exchange of real property. *Id.*, 325 P.3d 123 (Utah Ct. App. 2014). The City sold to Northgate several parcels of land on which the City had operated a public works facility to mine sand. The purchase agreement permitted Northgate to rescind the contract if the results of an environmental audit of the property were unacceptable and also included a provision describing Northgate's intent to apply for federally-funded qualified redevelopment projects. The federal government pays these funds directly to municipalities, who then ultimately determine how to distribute the funds. The contract noted Northgate would apply for these funds through Orem's Economic Development Commission but also stated the City could not "make any representations to Northgate as to whether Northgate [would] receive these funds." *Id.* at 126.

After closing on the purchase agreement and beginning excavation, Northgate discovered the City had backfilled the land with dirt and rock, as well as "a trove of urban detritus," ranging from washing machines and asbestos-containing transit pipes to barbed wire, fire hydrants, and bags of leaves. *Northgate Vill.*, 325 P.3d at 125. After determining cleaning up the site would cost between $2 and $3 million, Northgate applied for the federal redevelopment loans and grants, and the Economic Development Commission recommended Northgate's application to the City for final review and approval. The City ultimately denied the application and Northgate sued for breach of the implied covenant of good faith and fair dealing, among other claims. *Id.* at 126-27. The court of appeals concluded the City had not breached the covenant because the contract gave the City the discretion to deny the application and Northgate had not identified evidence that the City denied the

application with the intent to destroy or injure Northgate's right to receive the fruits of the contract. *Id.* at 132 (quoting *Oakwood Vill.*, 104 P.3d at 1239). Further, the court concluded the record evidence supported "the City's assertion that it denied Northgate's application through its ordinary deliberative process." *Northgate Vill.*, 325 P.3d at 132.

As in *Northgate Village*, the parties here knew Merrill Lynch would play a role in deciding whether the pledged collateral was adequate to support the loan, as well as in determining whether to liquidate collateral. The evidence also establishes Merrill Lynch used its ordinary deliberative process in evaluating and making these decisions. Further, while Merrill Lynch previously decided to permit the Kinzels to use an increasingly dominant percentage of Cedar Fair units to collateralize the loan, the evidence regarding Merrill Lynch's decision to liquidate is insufficient to establish that the decision was motivated by an intent to destroy or injure the Kinzels' rights or justified expectations under the LMA Agreement.

Nor does the parties' course of conduct establish a violation of the duty of good faith and fair dealing. The Kinzels consistently and continually told Merrill Lynch they did not want to sell the Cedar Fair units but were willing to sell all other collateral as well as pay down the loan with cash. Merrill Lynch accommodated this preference from October 2008 until March 3, 2009. The Kinzels have not proven, however, that this forbearance negated or limited the contract's assignment of discretion to Merrill Lynch. *See Young Living*, 266 P.3d at 819 ("The covenant is not a license for the judiciary to codify standards of altruism that a party may have held itself to in the course of its contract performance."); *see also Iota, LLC v. Davco Mgmt. Co., LC*, 284 P.3d 681, 691 (Utah Ct. App. 2012) ("Declining to give up rights granted by a contract does not constitute a breach of the covenant of good faith and fair dealing . . . ." (citation omitted)).

The Kinzels also argue the Cedar Fair units should not have been liquidated because the LMA never exceed the 70% maintenance ratio. This ratio, however, is found in Merrill Lynch

policies and not in the LMA Agreement. The contract gives Merrill Lynch discretion to set the maintenance level, without specifying any limits on the exercise of that discretion. *Cf. Smith v. Grand Canyon Expeditions Co.*, 84 P.3d 1154, 1159-60 (Utah 2003) (holding the covenant of good faith and fair dealing had limited utility where the parties "defined their expectations and imposed limitations on the exercise of discretion through express contract terms" requiring company to determine net book value through the use of generally accepted accounting principles). While the maintenance level informs the reasonableness of Merrill Lynch's conduct, a failure to comply with this ratio does not mandate condemnation of Merrill Lynch's liquidation decision.

Additionally, the evidence is insufficient to establish that Merrill Lynch exercised its discretion to liquidate "for a reason outside the contemplated range – a reason beyond the risks assumed by the party claiming the breach." *Markham v. Bradley*, 173 P.3d 865, 875 (Utah Ct. App. 2007) (emphasis removed) (quoting *Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 451 (Utah Ct. App. 1994)). As the Kinzels note, Yanovitch testified that instead of making a demand for repayment on a loan, at times Merrill Lynch would change or remove the maintenance level "at a particular point in time without notice to the client . . . [with] the net result being a margin call which can compel repayment." (Doc. No. 211 at 46).

The Kinzels argue this testimony establishes a breach of the covenant of good faith and fair dealing because Merrill Lynch used this mechanism to avoid issuing a formal demand for repayment. I previously ruled the LMA Agreement does not mandate that Merrill Lynch make a demand before liquidating collateral. (*See, e.g.,* Doc. No. 141 at 6). The contract permitted Merrill Lynch to set the maintenance ratio and to determine whether the value of collateral was sufficient to support the loan, as well as to liquidate collateral if it determined the collateral was insufficient. Plaintiffs have not identified any evidence to support a reasonable inference as to Merrill Lynch's motivation for choosing to liquidate rather than issue a demand. Moreover, the evidence is unclear as to whether

10

the increased maintenance level reflected in the March 2009 statement had any impact on the sale of the collateral, as none of the emails from Merrill Lynch employees offered into evidence discuss increasing the maintenance level prior to March 2009.

Consequently, I conclude the Kinzels have failed to establish their claim by a preponderance of the evidence and Merrill Lynch is entitled to judgment on the Kinzels' claim for breach of the implied covenant of good faith and fair dealing.  *Cf. Oakwood Vill.*, 104 P.3d at 1240 ("While Albertsons may not have followed the golden rule in pursuing the course of conduct it did, Albertsons did not act in bad faith or violate any other implied covenant in its contract with Oakwood.").

### FINDINGS OF FACT

I. The Kinzels entered into a loan agreement with Merrill Lynch to finance the purchase of stock options and the associated tax consequences.

II. The LMA Agreement required the Kinzels to pledge securities as collateral for the loan.

III. As collateral, the Kinzels pledged the Cedar Fair units they purchased through the stock option, as well as other non-Cedar-Fair stocks and bonds.

IV. The LMA Agreement gave Merrill Lynch discretion to set the maintenance level for collateral pledged in support of the LMA, to determine the sufficiency of the value of that collateral, and to require additional collateral or liquidate collateral if it determined the collateral was insufficient.

V. The value of the Cedar Fair units, along with the stock market generally, declined during 2008 and the first quarter of 2009.

VI. The LMA neared or exceeded the loan maintenance requirement level on several occasions in October and November 2008, and Merrill Lynch requested the Kinzels pledged more collateral or pay down the loan balance.

VII. The Kinzels responded to each request by pledging additional collateral, paying down the loan balance, or both.

VIII. The LMA continued to experience collateral calls in January and February 2009.

IX. The Kinzels continued to respond to and satisfy these calls, and also pursued home equity lines of credit to raise cash to further pay down the loan balance.

X. Between April 2008 and February 2009, the Kinzels paid down the loan balance from $7.7 million to $4.0 million.

XI. On February 24, 2009, Yanovitch approved a price trigger of $7 per unit as the tipping point for the initiation of liquidation of Cedar Fair units.

XII. On March 2, 2009, Cedar Fair closed at $6.99 per unit.

XIII. On March 3, 2009, Merrill Lynch sold 167,900 units of Cedar Fair at an average price of $6.3806 per unit and applied the $1.07 million in sale proceeds to the LMA balance.

XIV. After the Kinzels provided documentation of forthcoming funds to satisfy the loan balance, Merrill Lynch suspended liquidation and instituted a new price trigger of $5.50 per share.

XV. The Kinzels paid off the LMA balance on March 26, 2009.

### CONCLUSIONS OF LAW

XVI. Utah law applies to the Kinzels' claim for breach of the implied covenant of good faith and fair dealing.

XVII. This covenant imposes a duty to "refrain from actions that will intentionally destroy or injure the other party's right to receive the fruits of the contract." *Oakwood Vill.*, 104 P.3d at 1239.

XVIII. The covenant also prohibits a party from exercising its discretion "for a reason outside the contemplated range – a reason beyond the risks assumed by the party claiming the breach." *Markham*, 173 P.3d at 875.

XIX.   Claims asserting breach of the covenant of good faith and fair dealing are evaluated through consideration of "the contract language and the course of dealings between and conduct of the parties." *St. Benedict's Dev. Co.*, 811 P.2d at 200 (emphasis removed).

XX.   The covenant of good faith and fair dealing requires Merrill Lynch to exercise its contractual discretion with "judgment based upon sincerity, honestly, fair dealing and good faith." *Resource Mgmt. Co.*, 706 P.2d at 1037-38.

XXI.   Merrill Lynch is entitled to judgment on the Kinzels' remaining claim because the Kinzels did not establish by a preponderance of the evidence that Merrill Lynch acted with the intent to destroy or injure the Kinzels' right to receive the fruits of the contract or acted for a reason outside the contemplated range.

## COUNTERCLAIMS

Merrill Lynch filed counterclaims against the Kinzel Trusts for indemnification and breach of contract. (Doc. No. 49 at 15-19). Merrill Lynch asserts section 11 of the LMA Agreement requires the Kinzel Trusts to indemnify them for attorney fees and costs incurred in defending against claims brought by Richard and Judith Kinzel, individually, and Brett Kinzel. They also claim the Kinzel Trusts breached the LMA Agreement by refusing to indemnify Merrill Lynch or to make assurances of future indemnification.

Under the LMA Agreement, each Loan Party agrees to indemnify Merrill Lynch (as the "Bank Parties") from:

> all claims, damages, judgment, penalties, costs, expenses, reasonable attorney's fees and court costs . . . that directly or indirectly arise from any of the following:
>
> - Any filing or registration fees, taxes or similar costs imposed on Bank Parties with respect to this Agreement, the LMA, or any Advance.
>
> - Any actions or failure to act by any Loan Party, or any predecessor or successor to such person, or any third party with whom such person has a contractual relationship.

- The performance by any of the Bank Parties under this Agreement, except if those Claims are caused by the Bank Parties' gross negligence or willful misconduct.

- Any breach of this Agreement by any Loan Party.

(Ex. 87 at 4; Doc. No. 1-1 at 4). A "Loan Party" is a "Guarantor," a "Borrower," and a "Pledgor." (Ex. 87 at 1; Doc. No. 1-1 at 1). A "Pledgor" includes "other parties" to the LMA Agreement. (Id.).

While Utah courts strictly construe indemnity agreements which purport to make a party responsible for another's negligence, they also require a party to indemnify the other's negligence when that intention is "clearly and unequivocally expressed" in the contract. *Shell Oil Co. v. Brinkerhoff-Signal Drilling Co.*, 658 P.2d 1187, 1189 (Utah 1983). A contract may express "a clear and unequivocal intent" to require one party to indemnify the other by mandating indemnity for all claims except those arising from "intentional wrongdoing or willful negligence." *Freund v. Utah Power & Light Co.*, 793 P.2d 362, 371 (Utah 1990).

A party's "failure to observe even slight care" constitutes gross negligence; this "requires proof of conduct substantially more distant from the appropriate standard of care than does ordinary negligence." *Pearce v. Utah Athletic Found.*, 179 P.3d 760, 767 (Utah 2008) (quoting *Berry v. Greater Park City Co.*, 171 P.3d 442, 449 (Utah 2007)); *see also Atkin Wright & Miles v Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 335 (Utah 1985) (Gross negligence "is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result."). A claim of willful misconduct involves proof the actor was aware his conduct probably would result in injury. *In re Worthen*, 926 P.2d 853, 868 (Utah 1996) (quoting *Golding v. Ashley Cent. Irrigation Co.*, 793 P.2d 897, 901 (Utah 1990)). Merrill Lynch bears the burden of proof with respect to its counterclaims. *See, e.g., Utah Co-op Ass'n v. Egbert-Haderlie Hog Farms, Inc.*, 550 P.2d 196, 197-98 (Utah 1976).

Merrill Lynch asserts the Kinzel Trusts are liable under the indemnity provision because Brett Kinzel's claims directly related to Merrill Lynch's liquidation of collateral. (Doc. No. 226 at 53). I previously concluded the Kinzels as individuals are parties to the LMA Agreement through the "other parties" clauses and granted Plaintiffs summary judgment on that issue. (*See* Doc. No. 154) Merrill Lynch has moved for reconsideration of this decision and asserts the Kinzel Trusts are liable under the indemnity provision for these claims as well. The indemnity clause is extremely broad, however, and could be read to cover claims brought by loan parties as well as third parties. Therefore, while I deny Merrill Lynch's motion for reconsideration below, I also will evaluate the counterclaims regarding the Kinzels as individuals.

Merrill Lynch argues the Kinzel Trusts are obligated to indemnify Merrill Lynch as to Richard, Judith, and Brett Kinzel's claims because those claims relate, directly or indirectly, to Merrill Lynch's liquidation of Cedar Fair units pledged as collateral for the LMA. Richard and Judith have asserted the same claims as the Kinzel Trusts throughout this litigation, including claims for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, negligence, breach of fiduciary duty, outrageous conduct, and estoppel. (*See* Doc. No. 1, 21, and 36). Brett Kinzel alleged Merrill Lynch failed to pay him a commission of approximately $20,000 on the liquidation sale of the Cedar Fair units and asserted claims against Merrill Lynch for breach of contract and conversion. (Doc. No. 1 at 4; Doc. No. 21 at 4). He dropped his claims with the filing of the Second Amended Complaint. (*See* Doc. No. 36). Merrill Lynch does not argue it is entitled to indemnification under any subsection of the indemnity clause other than the third of the four bullet points I quoted above.

Brett Kinzel testified he formerly was a plaintiff in this litigation, he did not contribute any money or securities to pay down or collateralize the LMA, and he did not receive the commission he believed he was due from the sale of the Cedar Fair shares. (Doc. No. 206 at 9, 28, 51). Merrill

15

Lynch asserts these facts are sufficient to require the Kinzel Trusts to indemnify Merrill Lynch for attorney fees and costs incurred in defending against Brett Kinzel's claims. (Doc. No. 226 at 53). This testimony, however, does not satisfy all elements of the claim Merrill Lynch has made. The LMA Agreement states Merrill Lynch is entitled to indemnification for fees and costs arising from claims relating to Merrill Lynch's performance of its obligations under that contract, but only when those claims do not result from gross negligence or willful misconduct. Though it has the burden of proof in this instance, Merrill Lynch does not explain why Brett Kinzel did not receive the commission and the mere fact that Brett Kinzel declined to continue pursuing his claims does not support an inference that Merrill Lynch's failure to pay the commission was proper.

Merrill Lynch's counterclaims regarding the Kinzels as individuals fail for similar reasons. Merrill Lynch argues only that it is entitled to recover because the Kinzels as individuals should not be considered parties to the LMA Agreement and they sued Merrill Lynch and its employees. (Doc. No. 226 at 53-55). Merrill Lynch has not offered evidence or argument to satisfy its burden to prove its conduct does not constitute gross negligence or willful misconduct. In ruling in Merrill Lynch's favor on the Kinzels' good faith and fair dealing claim above, I did not conclude Merrill Lynch's actions were proper. Instead, I concluded the Kinzels failed to meet their burden of proving by a preponderance of the evidence that Merrill Lynch's conduct violated the covenant of good faith and fair dealing imposed by Utah law.

### FINDINGS OF FACT

XXII. Richard, Judith, and Brett Kinzel brought claims against Merrill Lynch directly or indirectly related to Merrill Lynch's liquidation of securities pledged as collateral for the LMA.

XXIII. The LMA Agreement includes a provision requiring "Loan Parties" to indemnify Merrill Lynch for claims arising directly or indirectly from Merrill Lynch's performance under the LMA

Agreement, unless those claims arise from Merrill Lynch's gross negligence or willful misconduct.

XXIV. Merrill Lynch has not presented evidence sufficient to support a reasonable characterization of its conduct.

### CONCLUSIONS OF LAW

XXV. As noted above, Utah law governs the parties' dispute.

XXVI. Merrill Lynch bears the burden of proof with respect to its counterclaims. *See, e.g., Utah Co-op Ass'n*, 550 P.2d at 197-98.

XXVII. To prevail on a claim for breach of contract, a party must prove (1) the existence of a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages. *See, e.g., Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001).

XXVIII. Indemnity agreements generally will not be construed to cover losses to the indemnitee caused by his own negligent acts unless this intent is expressed clearly and unequivocally. *See Freund v. Utah Power & Light Co.*, 793 P.2d 362, 371-72 (Utah 1990); *Union Pac. R.R. Co. v. Intermountain Farmers Ass'n*, 568 P.2d 724, 725 (Utah 1977).

XXIX. The indemnity clause of the LMA Agreement purports to include negligent acts by implication. (*See* Ex. 87 at 8; Doc. No. 1-1 at 8 (requiring indemnity for claims arising from "[t]he performance of any of the Bank Parties under this Agreement, except if those claims are caused by the Bank Parties' gross negligence or willful misconduct")).

XXX. Nonetheless, the Kinzels are entitled to judgment on the indemnity counterclaim because Merrill Lynch has not proven, by a preponderance of the evidence, that their actions were not grossly negligent or the result of willful misconduct.

XXXI.   The Kinzels also are entitled to judgment on the breach of contract counterclaim because Merrill Lynch has not proven by a preponderance of the evidence that the Kinzels breached the LMA Agreement by refusing to indemnify Merrill Lynch.

## **MOTION FOR RECONSIDERATION**

Previously, I denied Merrill Lynch's motion for summary judgment while also granting in part and denying in part the Kinzels' motion for summary judgment.  In part, I concluded Richard and Judith Kinzel, as individuals, are parties to the LMA Agreement through the "Other Parties" clause of that contract, and granted summary judgment in their favor on that portion of their motion.  (Doc. No. 154 at 3-5).  Merrill Lynch seeks reconsideration of this ruling.  (Doc. No. 226 at 53-55).

Orders granting partial summary judgment are not considered final judgments.  *McWhorter v. ELSEA, Inc.*, No. 2:00-cv-473, 2006 WL 3483964, at *2 (S.D. Ohio Nov. 30, 2006).  Rather they are treated as interlocutory and may be modified or rescinded.  *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991).  While motions for reconsideration of interlocutory rulings are not subject to the strict deadlines set forth in Rule 59, *Sanders v. DaimlerChysler Corp.*, No. 3:05-cv-7056, 2007 WL 405926, at *1 (N.D. Ohio Feb. 1, 2007), district courts generally evaluate these motions by determining whether (1) there has been an intervening change in controlling law, (2) new evidence has been submitted, or (3) there is a need to correct a clear error or prevent manifest injustice.  *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004).

Merrill Lynch did not identify which part of this standard it believes justifies reconsideration of my earlier decision, but its arguments appear to fall into the latter two categories.  Merrill Lynch argues the language of the LMA Agreement does not make the Kinzels as individuals "other parties" to the contract and that evidence introduced at trial does not support my ruling.  (Doc. No. 226 at 53-57).

As an initial matter, Merrill Lynch disagrees with my interpretation of the LMA Agreement, arguing funds offered or securities pledged to pay down the balance of the LMA only make a nonsignatory an "other party" if there is formal documentation of the assignment of a lien or security interest. (Doc. No. 226 at 54). This argument fails for several reasons. First, Merrill Lynch made this argument in its summary judgment briefing. (*See, e.g.,* Doc. No. 145 at 3-5). "[I]t is not the function of a motion to reconsider . . . to renew arguments already considered and rejected by a court . . . ." *McConocha v. Blue Cross and Blue Shield Mut. of Ohio*, 930 F. Supp. 1182, 1183 (N.D. Ohio 1996).

Second, this argument would render meaningless language in the contract Merrill Lynch drafted. Section 6 of the LMA Agreement designates, as security for the LMA, securities accounts "designated by Pledgor as the collateral for the LMA herein . . . <u>as well as</u> all of Pledgor's right, title and interest in and to all monies, debts, claims, securities, securities entitlements, financial assets, investment property and other property deposited by Pledger with . . . any member of the Merrill Lynch Group." (Ex. 87 at 4; Doc. No. 1-1 at 4) (emphasis added). Section 2 makes "other parties" of those individuals who deposit security as defined by section 6. (Doc. No. 87 at 1 ("Other parties include any person who is providing . . . other collateral described below . . . .")).

Next, Merrill Lynch argues "[t]he evidence at trial" does not support my summary judgment ruling. This argument also fails. First, it does not meet the Rule 59 standard, as Merrill Lynch does not represent that any of the trial evidence it cites is "new evidence" that it was unable to present during summary judgment briefing. *See, e.g., Dice Corp. v. Bold Tech.*, 556 F. App'x 378, 384 (6th Cir. 2014) ("Rule 56(c) requires a party objecting to a motion for summary judgment to support its assertions by 'citing to particular parts of materials in the record.'" (quoting Fed. R. Civ. P. 56)).

Second, the trial evidence does not show "the facts supporting summary entry of summary judgment were incorrect or incomplete . . . ." (Doc. No. 226 at 55). For example, Richard Kinzel

averred he and his wife "used millions of dollars of their own resources to pay down the loan," including mortgages on their personal residences. (Doc. No. 116-2 at 4). He confirmed this at trial, testifying he obtained a mortgage on his home and applied the proceeds to the LMA balance. (Doc. No. 201 at 23-25). Merrill Lynch claims the Kinzels' cash payments did not make them "other parties" because "[f]or example, U.S. Trust wired loan proceeds from the Naples HELOC directly to the LMA loan account to pay down the loan balance, but U.S. Trust is not an 'other party' to the LMA loan." (Doc. No. 226 at 55). This analogy is a red herring. U.S. Trust loaned the money to the Kinzels, secured by the mortgage, and could claim no interest in the use of the money. Wiring the loan proceeds was an administrative act which merely facilitated – through deposit – the Kinzels' transfer of their interest in the money to Merrill Lynch.

Finally, to the extent it argues the Kinzels had a duty to present "evidence at trial" on this issue when they already obtained summary judgment, Merrill Lynch is mistaken. (*See* Doc. No. 226 at 55). Merrill Lynch has failed to satisfy the Rule 59 standard, and its motion for reconsideration is denied.

## CONCLUSION

For the reasons stated above, I conclude Merrill Lynch is entitled to judgment on the Kinzels' claim for breach of the implied covenant of good faith and fair dealing. I also conclude the Kinzels are entitled to judgment on Merrill Lynch's counterclaims for breach of contract and indemnification. Finally, Merrill Lynch's motion for reconsideration is denied.

So Ordered.

s/ Jeffrey J. Helmick  
United States District Judge